**Hilda Rembke, Appellee, v. Henry Bieser, Appellant.**

Opinion filed March 4, 1937.

WHEELER, OEHMKE & DUNHAM, of East St. Louis, for appellant.

PHILIP G. LISTEMAN and JOHN M. KARNS, both of East St. Louis, for appellee.

Mr. Presiding Justice Stone delivered the opinion of the court.

On Sunday, December 8, 1935, about one o'clock in the morning, plaintiff appellee, who will hereafter be referred to as plaintiff, and defendant appellant, who will hereafter be referred to as defendant, together with another couple, James Ardit and Vera O'Dell, started from East St. Louis, from a place known as the Egyptian Inn, to go to a resort known as the Villa Europa, which is south of East St. Louis and north of Dupo. It was a drizzly morning, the road was slippery, and as the parties proceeded southward they encountered dense banks of fog. This fog rendered progress very difficult. Plaintiff and defendant were sitting in the front seat together, and Mr. Ardit and Miss O'Dell were sitting in the rear seat. It was defendant's car, a V-8 Tudor sedan, which he himself was driving. The road runs almost straight south from East St. Louis and is known as No. 3 of the State system of durable hard-surfaced roads. It is an 18-foot slab. The farther south the parties traveled, the more dense the fog became and the more difficult the progress.

At a distance of something like a mile and a half from East St. Louis the car in which defendant was driving came into collision with a large Auburn car, which weighed about 1,800 pounds more than defendant's car. Serious injuries followed. The driver of the Auburn was killed; others in the respective cars were injured, and plaintiff received serious and permanent injuries. She was taken to a hospital where she received treatment. The nature and extent of her injuries are not of great consequence so far as this case is concerned, for there is no complaint that the damages assessed and finally allowed by the court are excessive.

Plaintiff brought suit against defendant under what is known in our State as the "guest law." In her

amended complaint, upon which this case was tried, she alleged among other things as follows:

"The defendant in violation of his duties and obligations to the plaintiff, willfully and wantonly and with a conscious indifference and disregard to her safety and well being, drove and operated his automobile over said roadway between the hours of sunset and sunrise when said automobile was displaying no light on the front thereof, or was displaying lights that were not visible at least 500 feet in the direction in which the automobile was proceeding, and he drove his automobile at a high and dangerous rate of speed, to wit, 45 miles per hour, which was a greater rate of speed than was reasonable and proper having regard to the conditions immediately surrounding said roadway, and he caused his automobile to be driven upon the left half of said highway and at all times failed and omitted to keep a proper lookout ahead for automobiles that reasonably could have been expected to be and remain on said roadway, and continued to drive and operate his automobile when his vision ahead was greatly obstructed and impaired and when he was not looking in the direction in which his automobile was traveling, and in all respects operated his automobile in a willful and wanton manner, showing an utter disregard for plaintiff's safety, and under circumstances which he well knew, or by the exercise of any care should have known, would likely cause great bodily injuries and danger to the plaintiff."

Defendant denied all allegations of the complaint and alleged as an affirmative defense that if defendant was guilty of wilful and wanton negligence in the premises that plaintiff was also guilty of wilful and wanton conduct which would prevent recovery upon her part.

The suit was brought in the city court of East St. Louis. A trial was had upon the foregoing pleadings

and a verdict rendered in favor of plaintiff in the sum of $9,500. Seasonable motions were made for directed verdict, new trial, and for judgment notwithstanding the verdict. All of these were overruled by the trial court, and after ordering plaintiff to remit the sum of $2,000, the court entered judgment in the sum of $7,500.

From this judgment defendant has appealed to this court and alleges that the verdict and judgment are contrary to the law; that they are against the manifest weight of the evidence in the case; that the court erred in not allowing defendant's motion to dismiss, or to transfer the case, and erred in not directing a verdict in favor of the defendant, and denying his motion for judgment notwithstanding the verdict and in refusing to award him a new trial.

We shall first take up the question of the jurisdiction of the court. Ill. State Bar Stats. 1935, ch. 110, ¶ 135; Jones Ill. Stats. Ann. 104.007 (sec. 131 of ch. 110, Smith-Hurd Rev. Stat.) provides:

"Except as otherwise provided in this Act, every civil action shall be commenced in the county where one or more defendants reside or in which the transaction or some part thereof occurred out of which the cause of action arose."

The collision in this case out of which the action arose occurred in St. Clair county, East St. Louis is in St. Clair county, and necessarily the city court of East St. Louis is in St. Clair county. Service on defendant was had within the corporate limits of East St. Louis. We know of no rule which prevents service on a defendant in the county where some part of the transaction occurs, if defendant is found in said county. It cannot be said that it is necessary to send process to the county in which defendant resides, when the court has jurisdiction by virtue of the cause of action arising in the county which is the situs of such court.

Rather, we think, the right given by the act is an expedient to insure service on the defendant in the county where he resides if such service cannot be had in the county in which the action arose. To argue otherwise would be to say that such defendant by coming into the county where the cause of action arose and remaining there could prevent service on him entirely. We are of the opinion that this act provides two places where a defendant may be sued and where he may be served. This being true, a defendant may be sued and served within and by any of the courts of the county which are given jurisdiction by reason of the accrual of the cause of action when he is found in such jurisdiction. Actions *ex delicto* for injuries to the person are transitory and may be brought within a jurisdiction other than that within which such injuries occurred. *Bruggemann v. Young,* 208 Ill. 181; *Swanson v. Moline, Rock Island & Eastern Traction Co.,* 204 Ill. App. 144, and cases there cited. The trial court did not err in retaining jurisdiction of this cause.

The chief contention of the defendant is that the verdict in this case is against the manifest weight of the evidence. On this contention our attention is called to the case of *Baumeister v. Bowers,* 271 Ill. App. 332. A glance at that case will show that it clearly comes within the exception which warrants courts in setting aside verdicts because they are against the manifest weight of the evidence. In that case appellee had no corroboration; she was contradicted on all points by the appellant and the circumstances favored the story told by appellant. That case has nothing in common with the case at bar.

In this case plaintiff testified that she started out that evening with defendant; went to a place called English Inn in East St. Louis and stayed there about an hour when she told him she wanted to go home. Instead he took her to Egyptian Inn, promising her

thereafter to take her home. They stayed at this place for a while where they met Vera O'Dell and the boy who was with her. When they came out of this place she asked defendant to take her home. He dissuaded her. They all then got into the car, she sitting on the right hand side of defendant and the other couple in the back seat. She did not know where they were going, but found that they intended to go to Villa Europa. It was misting when they started out. The pavement was damp and slippery. As they proceeded defendant drove his automobile on and off the road and would swing and go over the black line. They ran into banks of fog. She cautioned defendant about turning around and going back. He said, ''We are making it all right.'' She told him two or three times to turn around and go back and not continue in the fog. About 300 to 500 feet from where the injury occurred he made an effort to turn around by turning in a driveway, but instead of going back home, started down the road the same way. Again she cautioned him. He didn't always have lights burning on the automobile. She told him they would be killed. They passed an automobile 200 or 250 feet north of the place where the collision took place. The fog was light at the time; it got thicker as they drove on at the same speed. The fog got deeper until she could see only about 20 feet ahead. He still insisted that he would make it all right. They ran up to another car going in the same direction. She cautioned him to stay behind it, but he turned out anyhow. He got about 10 feet from the back of that car. He didn't decrease his speed any from the time he passed the first car. At the place where this accident happened the fog was very dense. She asked him not to go around that car because another car might be coming. You could see nothing in the fog. ''He told me he couldn't see and I asked him leave to drive, but he said he would drive the car.''

Florence Pool who was riding in the Auburn car said that she saw defendant's car when it was 18 to 20 feet away. "Almost all but the right back wheel was on our side of the street. When the cars came together our car was still on the east side. It was very foggy when we started and kept getting worse. I saw the Bieser car just before the impact and it looked like it was coming pretty fast. It was coming at a greater speed than our car."

Boyd Schrader testified that as he was going south on the same road, there was a fog at times in which you couldn't see a thing. The fog got worse the further south he went. The Ford passed his car going south 200 or 300 feet from where the collision occurred. "We had just come out of a bank of fog and gone into a small patch of it when the Bieser car passed us. It must have been around 75 to 100 feet before the car got out of our sight." As far as he could see it was still on the left side of the road, getting back over to the right side. It was not going straight; it was weaving. It was going around 35 to 40 miles an hour. He continued south and heard the sound of an impact after this car got out of sight. It couldn't have been very long. "We were following right behind him. When we got to the wreck the Auburn was parallel with the black line and on the east side. Half of the front of the Ford was over on the black line on the east side. Brady Brockes (the driver of the Auburn) was lying with his feet on the running board of his machine. His head and shoulders were west of the black line."

Ada Cannady testified that at the time of the collision the Auburn in which she was riding was on the east side of the road.

Theodore Kirk testified that he talked with defendant a couple of days after the accident happened at the hospital; that defendant told him it was a foggy, bad night. He was going down the highway towards

Dupo and all at once he ran upon an automobile; he turned out to go around it and as he turned out is when the accident happened. He said it was his fault and he was sorry.

Ralph Lamont testified that when he observed the cars the Ford was headed south with its left front wheel about a foot east of the black line and the rest of the car west of the center.

Fred Rembke, the father of the plaintiff, testified that he talked to defendant about the accident three or four days after it happened; that defendant said "I am sorry, but it was all my fault."

An examination of plaintiff's Exhibit 1 shows clearly an impact effecting defendant's car from the middle of the engine to the right front side. This is the side which would naturally be farthest west of the black line if it happened where defendant contends that it did.

This evidence is set out at length in pursuance of the contention of defendant that the court erred in not giving a peremptory instruction in the case. The court could not lawfully under any hypothesis known to us have given this instruction. Courts may not weigh the evidence on a motion for peremptory instruction. It was a question of fact for the jury whether the conduct of defendant was wanton or wilful.

In addition to the facts presented above it may be observed that the driving of an automobile in a fog such as the one described in this record is one of the most hazardous things that any driver can do. Anyone who has ever undertaken to drive a car in such a fog will not argue that question. For a driver of a car to turn out to pass another car at the rate of 35 or 40 miles an hour in such a fog under the protest of his guest might well show a reckless disregard for the safety, life and limb of his said guest. It is wanton and wilful in our judgment within the definitions

given by the courts. The court did not err in refusing the peremptory instruction at the close of plaintiff's evidence, nor at the close of all the evidence.

It is true that there are sharp contradictions as to many of the facts testified to and there are different versions by the different witnesses, as to the positions of the cars and as to what happened and as to what was said by plaintiff during the time they were driving south. But are we to say after the jury has passed upon all the evidence that the witnesses for the defendant were telling the truth or were not mistaken and that the witnesses for the plaintiff were either telling untruths or were mistaken? We are at a loss to see how counsel can so contend. This record, in our judgment, was a case distinctly for a jury to decide.

It is argued at great length that plaintiff's testimony is contradicted by previous statements she made at the coroner's inquest and by a statement she made in the hospital. We said in *Acquaviva v. Madison County Mut. Auto. Ins. Co.,* 285 Ill. App. 431 at 436, and we repeat here, that contradiction or impeachment does not go to the question of the competency of any witness, but only goes to his credibility. So that if the jury believed plaintiff's testimony, corroborated as it is by the facts and circumstances above detailed, the jury was within its rights in doing so. Furthermore, the circumstances of obtaining the statement at the hospital might have much to do in influencing the jury to believe the testimony of the plaintiff.

In view of the evidence above detailed, notwithstanding the contradictions referred to, and the verdict of the jury, we are constrained to say that the propositions of law which defendant has argued, while proper when applied to a proper state of facts, do not apply here. A glance at the conduct of defendant under the circumstances detailed in this record immediately raises the impression that his conduct was wanton

and wilful in the sense that he acted in utter disregard of the safety of those for whom he was temporarily responsible. The conduct of plaintiff was, likewise, a question of fact for the jury.

It would be idle to write at any length again on the well established rule that Appellate Courts will not set aside verdicts on questions of fact unless said verdicts are against the manifest weight of the evidence. However, the rule is so definitely laid down in the case of *People v. Hanisch,* 361 Ill. 465, that we feel warranted in calling attention to it again. The Supreme Court there said:

"Whatever may be the rule in certain other jurisdictions, we firmly adhere to our often-asserted belief that it is the province of the jury, alone, to determine the weight of the evidence and the credibility of the witnesses. If it were not so there would be little use for the jury system. The jury as a fact finding body is of such importance that an abridgment of its functions in this regard and an appropriation of them by the judges would mean the forsaking of a valued tradition in our system of jurisprudence. The utmost caution should be exercised not only by the trial courts, but by the reviewing courts to uphold the sanctity of the trial by jury."

We find no error in this record. The judgment of the city court is affirmed.

*Judgment affirmed.*